**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SE PROPERTY HOLDINGS, LLC, | ) | |
| | ) | **PUBLISH** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION 13-0267-WS-N** |
| | ) | |
| GEORGE S. BRASWELL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

This fraudulent transfer action comes before the Court on plaintiff's Motion for Partial Summary Judgment (doc. 98) and defendants' Motion for Summary Judgment (doc. 99). Both of these overlapping Rule 56 Motions have been briefed, with considerable duplication of argument along the way, and are now ripe for disposition.

**I.     Nature of the Action.**

This case is one of a number of fraudulent transfer actions that SE Property Holdings, LLC ("SEPH"), is pursuing in this District Court against guarantors of multimillion dollar loans made by SEPH's predecessor for the development and financing of certain real estate projects in Orange Beach, Alabama, known as Bama Bayou and Marine Park. When the projects failed and the loans went into default, the guarantors declined to pay, thereby embroiling SEPH and the guarantors in many years of litigation spanning numerous cases and courts, including this District Court and the Mobile County Circuit Court, as well as probate and bankruptcy courts.

In this particular action, SEPH filed its First Amended Complaint (doc. 22) against defendants, George S. Braswell and Vennie T. Braswell, alleging that George Braswell ("Braswell") executed guaranties exceeding $1.1 million on loans made by SEPH's predecessor for the Bama Bayou / Marine Park project. After the borrowers defaulted on those loans, Braswell transferred certain real property to his wife, Vennie Braswell ("Mrs. Braswell"), on or about May 19, 2009. In particular, the Complaint alleges that Braswell conveyed to Mrs. Braswell the couple's primary residence in Baldwin County (purportedly valued at between $1

million and $2.5 million, with a mortgage balance of $600,000) and a Baldwin County condominium unit (purportedly valued at $500,000, with no outstanding mortgage balance). SEPH maintains that both transfers violate the Alabama Uniform Fraudulent Transfer Act, Ala. Code §§ 8-9A-1 *et seq.* (the "AUFTA"), in multiple respects.

The First Amended Complaint alleges three distinct AUFTA causes of action against the Braswells. In Count One, SEPH brings a claim of actual fraudulent transfer, in violation of Alabama Code § 8-9A-4(a), based on allegations that Braswell made the subject transfers with the intent of hindering, delaying or defrauding SEPH's predecessor. In Count Two, SEPH asserts a claim of constructive fraudulent transfer, in violation of Alabama Code § 8-9A-4(c), based on allegations that Braswell's remaining assets after the transfers were unreasonably small and he believed or should have believed that he would be called upon to pay debts beyond his ability to pay. In Count Three, SEPH advances a claim of constructive fraudulent transfer, in violation of Alabama Code § 8-9A-5(a), predicated on an allegation that Braswell was insolvent at the time of, or as a result of, the subject transfers. Finally, in Count Four, SEPH brings a claim of civil conspiracy, alleging that the Braswells conspired with each other in effecting the subject asset transfers, all to SEPH's detriment in being deprived of assets that could have been used to collect on Braswell's guaranty obligations.

## II.    Factual Background.[1]

### A.    *The Loans and Guaranties.*

Between 2005 and 2007, SEPH's predecessor (Vision Bank) entered into a series of four commercial loan agreements whereby it loaned $21 million to entities called Bama Bayou, LLC

---

[1]    The Court remains mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the non-movant. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). As to each cross-motion for summary judgment, then, the record will be viewed in the light most favorable to the non-movant. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept [non-movant]'s version of the facts drawing all justifiable inferences in [non-movant]'s favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

(formerly known as Riverwalk, LLC) and Marine Park, LLC. (Corbitt Aff. (doc. 101, Exh. A), ¶ 5.) Those loans were fully funded by Vision Bank and its participant banks. (*Id.*, ¶ 7.)

In connection with each of those loans, George Braswell executed a limited continuing guaranty in favor of Vision Bank. (Corbitt Aff., ¶ 6.) First, on or about March 10, 2005, he executed a guaranty with respect to Vision Bank's $6 million loan to Riverwalk, LLC in March 2005. (*Id.*, ¶ 6 & Exh. A-2.) In that guaranty, Braswell agreed to be liable for up to $315,000 in principal of the note, as well as 100% of all interest on the loan accruing at any time, and 100% of collection costs, expenses, and reasonable attorney's fees. (*Id.*, Exh. A-2 at ¶ 14.) Second, on or about May 20, 2006, Braswell executed a guaranty with respect to Vision Bank's $5 million loan to Riverwalk LLC in June 2006. (Corbitt Aff., ¶ 6 & Exh. A-3.) In that guaranty, he agreed to be liable for up to $280,000 in principal of the note, as well as 100% of all interest on the loan accruing at any time, and 100% of collection costs, expenses, and reasonable attorney's fees. (*Id.*, Exh. A-3 at ¶ 14.) Third, on or about September 25, 2007, Braswell executed a guaranty with respect to Vision Bank's $5 million loan to Bama Bayou, LLC in September 2007. (Corbitt Aff., ¶ 6 & Exh. A-4.) In that guaranty, he agreed to be liable for up to $280,000 in principal of the note, as well as 100% of all interest on the loan accruing at any time, and 100% of collection costs, expenses, and reasonable attorney's fees. (*Id.*, Exh. A-4 at ¶ 14.) And fourth, on or about December 17, 2007, Braswell executed a guaranty with respect to Vision Bank's $5 million loan to Marine Park, LLC in March 2007. (Corbitt Aff., ¶ 6 & Exh. A-5.)[2] In that guaranty, he agreed to be liable for up to $280,000 in principal of the note, as well as 100% of all interest on the loan accruing at any time, and 100% of collection costs, expenses, and reasonable attorney's fees. (*Id.*, Exh. A-5 at ¶ 14.)

---

[2] It bears noting that, while SEPH (as Vision Bank's successor by merger) holds the Bama Bayou loans, notes and guaranties, the Marine Park, LLC note was transferred to FNB Bank, which is not a party to these proceedings, sometime after May 19, 2009. (Corbitt Aff., ¶ 7.) SEPH's objective in this this litigation is to facilitate collection of the Bama Bayou loans and guaranties, not the Marine Park loan and guaranty, which it no longer holds and which it has no direct interest in enforcing. Nonetheless, the Marine Park guaranty is pertinent to the issues presented on summary judgment, inasmuch as Vision Bank held the Marine Park debt at the time of the challenged transfers, and Braswell's obligations under that guaranty bear on his solvency or lack thereof when those transfers occurred.

### B.    The Defaults and SEPH's Collection Efforts.

Plaintiff's evidence is that, even though the loans had been fully funded, Bama Bayou, LLC and Marine Park, LLC defaulted under the loans and notes sometime prior to January 2009. (Corbitt Aff., ¶¶ 7-8.)  Vision Bank subsequently demanded payment from the borrowers and guarantors, including Braswell.  (*Id.*, ¶ 8.)  When payment was not forthcoming, Vision Bank sued Bama Bayou, Marine Park, Braswell, and others in the Circuit Court of Mobile County, Alabama, on January 16, 2009 (the "*Bama Bayou* Action").  (*Id.*)  The *Bama Bayou* Action remains pending today.  To date, it has not gone to trial; indeed, the Court's understanding is that no trial setting is in place at this time.

On March 20, 2009, as part of its collection activities, Vision Bank foreclosed on multiple parcels of real property that secured its loans to Bama Bayou and Marine Park, purchasing such property via credit bids.  (*Id.*, ¶ 9.)  In the wake of those foreclosure sales, large deficiencies remained on the Bama Bayou and Marine Park loans.  Indeed, plaintiff's calculations are that, as of February 21, 2017, Braswell owes SEPH the sum of $875,000 in principal on the Bama Bayou / Riverwalk guaranties, as well as $9,294,012.19 in interest on those loans (exclusive of attorney's fees and costs of collection).  (*Id.*, ¶ 16.)

### C.    The Challenged Transfers.

As noted, SEPH's claims herein focus on a pair of real property transfers made by Braswell to his wife, Mrs. Braswell, who is not a signatory on the subject guaranties and is not directly indebted to SEPH on the Bama Bayou / Riverwalk loans.  Both of the challenged transfers occurred on May 19, 2009, some four months after Vision Bank commenced the *Bama Bayou* Action against Braswell to collect on the underlying debt.

The first transfer from Braswell to Mrs. Braswell was of real estate described as "Unit 1001, The Sands at Romar Beach, a condominium, located in Baldwin County, Alabama."  (Doc. 101, Exh. G, at 1.)  The Warranty Deed executed by Braswell conveyed and transferred to Mrs. Braswell his entire ownership interest in that condo unit, in exchange for a listed consideration of $10.00 cash.  (*Id.*)  Braswell confirms that his wife paid him no other consideration for that conveyance.  (Braswell Dep. (doc. 101, Exh. H), at 28.)  Braswell listed the value of that beach condo during the relevant time period as being $500,000.  (Doc. 101, Exh. K at Exh. 2; doc. 105, Exh. B.)

The second transfer from Braswell to Mrs. Braswell was of real estate described as "Lot 73, of Sandy Creek Farms, Phase I." (Doc. 101, Exh. F, at 1.) This property was the couple's primary residence. (Braswell Dep., at 143.) As with the Romar Beach condo, the only consideration furnished by Mrs. Braswell to her husband in exchange for this conveyance was $10.00 cash. (*Id.*) Braswell listed the value of the Sandy Creek Farms residence during the relevant time period as being $1 million, but a January 2008 appraisal valued it at $1,365,000. (Doc. 101, Exh. J at Supp. Exh. 3a; doc. 105, Exh. B.)

George Braswell executed deeds conveying both of these properties to Vennie Braswell on May 19, 2009. (Doc. 24, ¶¶ 6, 8, 14.) Whether coincidentally or otherwise, this was precisely one day before Vision Bank foreclosed on the mortgaged real property securing its loans to Bama Bayou.

Defendants' evidence is that these transfers were made in the ordinary course of estate planning activities with their attorney, Mort Swaim. In particular, defendants show that Braswell first met with Swaim for estate-planning purposes in February 2008. (Doc. 10, Exh. 23.) When Braswell consulted with Swaim again in May 2009, he did so for the stated purpose that he "wanted to update his estate plan." (Swaim Dep. (doc. 100-1, Exh. 5), at 68.) Defendants' evidence is that the transfers of Braswell's interest in the Sandy Creek Farms residence and the Romar Beach condo to Mrs. Braswell were made pursuant to Swaim's advice that they "balance their assets for estate-planning purposes." (*Id.* at 179.) According to Swaim, "the moment [Braswell] went above one million, … he had a tax problem. So I wanted to hit the … two main assets that I was aware of, which was this house and this condo." (*Id.* at 28-29.) In his deposition, Braswell testified that the goal of these transfers was to "[r]educe taxes." (Braswell Dep. (doc. 100-1, Exh. 6), at 157.)

### D. Braswell's Assets and Liabilities Following the Transfers.

Notably, as of May 19, 2009, Braswell's liabilities were far beyond the $875,000 in principal he owed on the Bama Bayou / Riverwalk guaranties, the $280,000 in principal he owed on the Marine Park guaranty, and the accrued interest and costs of collection on all of those loans.[3] Indeed, Braswell was also indebted to Vision Bank in the amount of $900,000 in

---

[3] Plaintiff's uncontroverted calculations of accrued interest on those four loans as of May 19, 2009, are as follows: (i) $205,833 in interest on the March 2005 loan to Riverwalk; (Continued)

principal and $21,621 in interest pursuant to a guaranty that he had executed in September 2007 for a loan to Sundance, LLC. (Corbitt Aff., ¶¶ 12, 15.) Braswell and others had also signed a $2,500,000 promissory note in 2003 and a $3,100,000 promissory note in 2004 as part of the consideration for Braswell and nine other individuals to purchase stock in a company called Gulf World, Inc. (Doc. 101, Exhs. D & E; Hardy Dep. (doc. 101, Exh. C), at 10.) No more than $50,000 in principal was ever paid on those notes, even though the full balance was due and owing as of January 1, 2007. (Hardy Dep., at 13-15, 18-19.) Braswell was individually liable for the full amount of the Gulf World notes.

Given the importance of the relative magnitudes of Braswell's assets and liabilities at the time of the subject transfers to the legal issues joined in these proceedings, it is no surprise that each side has retained a Certified Public Accountant to serve as an expert witness herein. As defendants correctly point out, "[t]he two expert CPAs agreed on the value of many assets and liabilities; but they disagreed on the value of a few, resulting in a difference of opinion as to Braswell's solvency before and after the transfers." (Doc. 100, at 7.) On the asset side of the ledger, there are only two significant differences between the experts' competing valuations. Both witnesses agree that Braswell's assets immediately after the May 19, 2009 transfers were approximately $1.4 million, plus (i) the value of his interest in Gulf World, Inc., and (ii) the value of his "Gulf World, Inc. right of contribution." (Doc. 101, Exh. J, at Supp. Exh. 3a; doc. 101, Exh. K, at Exh. 2.) Plaintiff's expert (Stacy Cummings) places a value of $190,000 on Braswell's interest in Gulf World, Inc., whereas defendants' expert (Mark Pawlowski) values that interest at $700,000. Moreover, plaintiff assigns no value to Braswell's "right of contribution," whereas defendants' expert assigns it a value of $5,169,230. (*Id.*)

On the liability side, both experts agree that as of May 19, 2009, Braswell had at least $6.1 million in liabilities, including the Gulf World promissory notes (in the amounts of $3.1 million and $2.5 million, as discussed *supra*) as well as more than $500,000 in a HELOC through Regions Bank. (Doc. 101, Exh. J at Supp. Exh. 3a; doc. 101, Exh. K at Exh. 2.) However, Cummings (SEPH's expert) also lists among Braswell's liabilities some $1.155

_____

(ii) $211,111 in interest on the June 2006 loan to Riverwalk; (iii) $167,006 in interest on the September 2007 loan to Bama Bayou; and (iv) $246,426 in interest on the Marine Park loan. (Corbitt Aff., ¶ 14.)

million in principal for the Riverwalk / Bama Bayou / Marine Park guaranties, as well as $830,000 in interest on those associated loans, $900,000 for the Sundance guaranty, and $21,621 in interest on the Sundance loan. By contrast, Pawlowksi (the Braswells' expert) lists <u>none</u> of these items among Braswell's liabilities. (*Id.*) These and other differences give rise to a $2.9 million discrepancy between the two experts' liability calculations for Braswell as of the applicable transfer date.[4]

## III. Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

---

[4] Cummings also lists a second Regions Bank HELOC loan from Regions Bank amidst Braswell's liabilities, in the amount of $523,467. (Doc. 101, Exh. J at Supp. Exh. 3a.) Pawlowski does not, noting that there is "some confusion" in the matter and explaining that his research has identified "only one line of credit account opened up" with Regions Bank, not two. (Doc. 101, Exh. K at 4.) That discrepancy need not be resolved definitively on summary judgment, because the insolvency analysis is unchanged with or without a second $500,000 HELOC liability.

Here, both sides have moved for summary judgment on certain AUFTA causes of action. It is well-settled that "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment." *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same). The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits"). Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Page*, 702 F. Supp.2d at 1345 (citations omitted); *see also Murray*, 620 F. Supp.2d at 1307. Such is the case here.

## IV. Analysis.

As noted, SEPH has brought three fraudulent transfer claims against the Braswells pursuant to the AUFTA, as well as a fourth claim for civil conspiracy. The Braswells move for summary judgment on all claims, whereas SEPH seeks summary judgment solely on the two constructive fraudulent transfer causes of action found in Counts Two and Three. The contours of each statutory cause of action differ; however, they also share certain common elements. In particular, each AUFTA claim requires that there be a creditor/debtor relationship between SEPH and Braswell at the time of the subject transfers. *See* Ala. Code §§ 8-9A-4(a), 8-9A-4(c), 8-9A-5(a) (each defining circumstances in which a "transfer made by a debtor is fraudulent as to a creditor"). Likewise, each constructive fraudulent transfer claim (*i.e.*, Counts Two and Three) requires proof that "the debtor made the transfer without receiving a reasonably equivalent value." *See* Ala. Code §§ 8-9A-4(c), 8-9A-5(a). Accordingly, the Court will begin by addressing these common elements, then move on to a claim-by-claim analysis.[5]

---

[5]      For purposes of this discussion, the Court is mindful of the Alabama Supreme Court's admonition that transfers of property between family members during litigation against (Continued)

*A.    The "Creditor/Debtor Relationship" Element.*

As indicated, the AUFTA only classifies as fraudulent certain transfers "made by a debtor … as to a creditor." Ala. Code. §§ 8-9A-4(a), 8-9A-4(c), 8-9A-5(a). The statute defines "creditor" as "[a] person who has a claim." Ala. Code § 8-9A-1(4). The term "debtor" is defined as "[a] person who is liable on a claim." Ala. Code § 8-9A-1(6). And the AUFTA defines "claim" as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Ala. Code § 8-9A-1(3).

Plaintiff's evidence on this element is both straightforward and undisputed. Indeed, SEPH has made an uncontroverted showing of each of the following facts: (i) SEPH's predecessor loaned $16 million to Bama Bayou, LLC (including loans to that entity under its former name of Riverwalk, LLC) between March 2005 and September 2007; (ii) Braswell executed limited continuing guaranties on those loans in the total principal amount of $875,000, plus 100% of all interest and collection costs that accrue; (iii) Bama Bayou defaulted under all three loans and notes; (iv) SEPH's predecessor demanded payment from borrowers and guarantors; (v) despite their promises in the notes and guaranties, neither Braswell nor any other borrower or guarantor paid those principal amounts, interest and collection costs; and (vi) after the default, SEPH's predecessor filed suit against debtors and guarantors (including Braswell) in state court in January 2009. These record facts constitute an affirmative showing that Braswell executed binding, enforceable guaranties in SEPH's favor, then failed or refused to pay upon

---

the transferor must be scrutinized with particular care. *See, e.g., Cox v. Hughes*, 781 So.2d 197, 205 (Ala. 2000) ("[c]onveyances of property between family members in the face of a pending suit against the grantor must undergo especially careful scrutiny") (citations omitted); *Reese v. Smoker*, 475 So.2d 506, 508 (Ala. 1985) ("The Court recognizes that conveyances of property between family members in the face of a pending suit against the transferor must be carefully scrutinized."); *Waddle v. Great Southern Phosphate Co.*, 63 So. 462, 463 (Ala. 1913) ("Where the contract is between near relations, as between husband and wife, father and son, and the like, it will be subjected to a closer scrutiny … than if the parties to it were strangers. … Such purchases are so often made a cover for a debtor's property, are so frequently resorted to for the purpose of withdrawing his property from the reach of his creditors and preserving it for his own use, and they hold forth such temptations for fraud, that they require close scrutiny.").

demand when the borrowers defaulted. Such facts would establish that, as of May 19, 2009, Braswell was a "debtor" and SEPH's predecessor was a "creditor" for AUFTA purposes.

In response, defendants argue that a two-page order entered in the *Bama Bayou* Action on October 16, 2016 "established there is no debt." (Doc. 104, at 11.) The October 16 Order set aside the March 2009 foreclosure sales on the grounds that Vision Bank's credit bids upon foreclosure were "so grossly inadequate as to shock the judicial conscience." (Doc. 100-2, at Exh. 1.) On the basis of that finding, the October 16 Order concluded as follows:

> "[T]he Court finds the extremely low bids at the foreclosure sale raise the presumption of unconscionableness and the grossly inadequate prices coupled with substantial evidence of misconduct justifies setting aside the foreclosure sale. The Court hereby sets aside the foreclosure sale and declares the foreclosure deeds null, void and of no force and effect."

(*Id.*) Nowhere in the October 16 Order did Judge Stewart declare the underlying debt to be wiped away, the underlying notes and guaranties to be void or otherwise unenforceable, or Bama Bayou, Braswell or any other guarantor not to be liable on SEPH's claims. Rather, the October 16 Order simply set aside the foreclosure sales. On its face, that Order said nothing that would alter SEPH's status as a "creditor" for AUFTA purposes and Braswell's status as a "debtor" for AUFTA purposes, as of the May 2009 transfers at issue here.

Notwithstanding the facially narrow ruling in the October 16 Order, defendants posit that its effect is to "eliminate[e] all alleged debt." (Doc. 104, at 11.) According to defendants, the October 16 Order must mean that Judge Stewart found Thomas Bealle's appraised values of the foreclosed parcels to be accurate and correct. That being the case, defendants reason, Bealle's valuations are such that Bama Bayou's assets exceed its liabilities; in other words, defendants' position is that the value of SEPH's collateral (the parcels of real estate on which it has the right to foreclose) exceed the value of the debt, so there is no debt. (*Id.* at 11-13.) The argument suffers from multiple flaws. First, the October 16 Order lacks findings of fact that assign specific valuations to the subject parcels. Second, the October 16 Order is devoid of any findings of fact or conclusions of law that Bama Bayou, Braswell or any other guarantor is not indebted to SEPH.[6] The October 16 Order did nothing more than set aside the foreclosure sales.

---

[6] This is so, despite the fact that certain debtors urged Judge Stewart "to simply credit the fair value of the property, which should have been bid at the foreclosure sale, against the debt." (Doc. 108, Exh. B, at 3.) Their stated position was that "[a] conclusion by the court (Continued)

This Court will not credit the Braswells' attempts to read into that ruling more cataclysmic factual and legal determinations than it actually made.

Third, and more broadly, defendants' argument presupposes that SEPH was obligated to pursue foreclosure of the mortgages as a necessary prerequisite to accrual of liability for Braswell. This notion is incorrect, as a matter of law. Under Alabama law, a mortgagee such as SEPH is not legally obligated to foreclose on the property before it may sue a guarantor for the debt. *See, e.g., Triple J Cattle, Inc. v. Chambers*, 551 So.2d 280, 282 (Ala. 1989) ("Upon a default by the mortgagor, the mortgagee has three remedies, and he may pursue any one or all of them until the debt is satisfied. … He is not required to foreclose the mortgage first, but may bring his action on the note alone.").[7] And defendants identify no provision in the guaranties signed by Braswell or the underlying loans and promissory notes that would restrict SEPH's remedies or compel it to foreclose first.[8] Thus, even if the Braswells are correct that foreclosure

_____

that the fair value of the property exceeded the debt on the date of the foreclosure would effect a release of all the Counterclaim Plaintiffs from any deficiency." (*Id.* at 5.) Judge Stewart neither endorsed that reasoning nor granted such a remedy. She did not find that the debtors were due a credit for the fair value of the property, and she did not release borrowers or guarantors from any deficiency; to the contrary, the *Bama Bayou* Action is still pending today, more than seven months after entry of that October 16 Order. By contrast, if the Braswells' reasoning were correct, the October 16 Order would have terminated the *Bama Bayou* Action because there would no longer be any outstanding debt for SEPH to collect. Defendants are asking this Court to construe the October 16 Order in a manner that even its author has not.

[7]     *See also Whitney Bank v. Point Clear Development, LLC*, 2012 WL 2277597, *5 (S.D. Ala. June 18, 2012) ("Alabama courts have expressly declined to impose any such mandatory duty of foreclosure in the mortgage context."); *In re Phillips*, 439 B.R. 892, 896 (N.D. Ala. 2010) (under Alabama law, "the creditor may elect to file suit to collect the debt and reduce his claim to a judgment lien without first foreclosing the mortgage").

[8]     To the contrary, the underlying mortgages describe the bank's remedies as cumulative, not exclusive. *See, e.g.,* doc. 101, Exh. A-6 at § 2.15 ("No right, power, or remedy conferred upon or reserved to the Lender by this Mortgage is intended to be exclusive of any other right, power or remedy, but each and every such right, power and remedy shall be cumulative and concurrent, and shall be in addition to any other right, power and remedy given hereunder, or under the Note, or under the Loan Documents …."). Likewise, the guaranties executed by Braswell provided that his guaranty obligations were unaffected by the existence of any security or the bank's resort to other remedies. *See, e.g.,* doc. 101, Exh. A-2 at § 4 ("It is the intent hereof that the obligations of the Guarantor shall be and remain unaffected … by the existence or non-existence, validity or invalidity of any pledge, assignment or conveyance given (Continued)

sales on the collateral would eliminate the Bama Bayou debt to which Braswell's guaranties are related, neither Alabama law nor the relevant contract documents oblige SEPH to conduct those foreclosure sales as a condition precedent to suing Braswell for the deficiency.

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact as to the existence of a creditor/debtor relationship between Vision Bank and Braswell at the time of the challenged transfers. Taking the evidence in the light most favorable to defendants, Braswell was a "debtor" for AUFTA purposes and SEPH's predecessor was a "creditor" for AUFTA purposes as of May 19, 2009. The Court therefore finds as a matter of law that plaintiff has satisfied the creditor/debtor element of each AUFTA cause of action asserted in the Complaint.

### B. *The "Reasonably Equivalent Value" Element.*

Another common element of certain AUFTA claims asserted herein is the "reasonably equivalent value" requirement. In each of the constructive fraudulent transfer claims set forth at Counts Two and Three, the plaintiff must show that "the debtor made the transfer without receiving a reasonably equivalent value in exchange." Ala. Code. §§ 8-9A-4(c), 8-9A-5(a). The AUFTA provides that "[v]alue is given for a transfer if, in exchange for the transfer, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise to furnish support to the debtor." Ala. Code § 8-9A-3(a). Notably, in the AUFTA constructive-fraud context, Alabama courts distinguish between "valuable consideration" (which does not give rise to a constructive fraudulent transfer) and merely "good consideration" (which can). *See, e.g., McPherson Oil Co. v. Massey*, 643 So.2d 595, 596 (Ala. 1994) ("[T]he law infers constructive fraud when it appears that an indebted grantor has conveyed property to a family member without receiving valuable consideration."); *Reese v. Smoker*, 475 So.2d 506, 508 (Ala. 1986) ("The term 'constructive fraud' is generally used in referring to those instances where a grantor, indebted at the time, conveys property on a good as distinguished from a valuable consideration.").

---

as security; or … by resort on the part of the Bank to any other security or remedy for the collection of said Indebtedness ….").

In evaluating whether valuable – as opposed to simply good – consideration has been given, the Uniform Fraudulent Transfer Act ("UFTA") as adopted in Alabama and other jurisdictions contemplates that courts must examine the nature and adequacy of the consideration from the standpoint of the creditor, not that of the debtor or the transferee of the subject property. In that regard, Comments to the UFTA clarify that "[v]alue is to be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors. ***Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition***." *Uniform Fraudulent Transfer Act 1984*, § 3, comment 2 (emphasis added). Courts have embraced this principle. As one federal court applying Alabama's version of the UFTA explained, "Whether a debtor received reasonably equivalent value is to be determined in light of the AUFTA's purpose – to protect creditors. … Accordingly, the value of consideration given for an alleged fraudulent transfer is determined from the standpoint of the debtor's creditors." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 667 (N.D. Tex. 2011) (citations omitted).[9]

To establish reasonably equivalent value, defendants do not suggest that Mrs. Braswell transferred any valuable property to Braswell in exchange for the transfers of the Sandy Creek

---

[9]     *See also In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) ("To measure reasonably equivalent value, we judge the consideration given for a transfer from the standpoint of creditors. … The proper focus is the net effect of the transfers on the debtor's estate, [and] the funds available to the unsecured creditors.") (citations omitted); *In re Sergio*, 552 B.R. 9, 21 (Bankr.D. Mass. 2016) ("[A] determination of whether indirect benefits suffice as fair consideration turns on whether the debtor's net worth has been preserved and creditors' interests have not been injured as a result of the transfers.") (citation omitted); *In re David Cutler Industries, Ltd.*, 502 B.R. 58, 73 (Bankr.E.D. Pa. 2013) (for UFTA purposes, "the court determines whether value was received from the vantage of the creditor," and the "touchstone" of the "reasonably equivalent value" analysis is "whether the parties exchanged comparable realizable commercial value") (citation omitted); *In re Blixseth*, 489 B.R. 154, 184 (Bankr.D. Mont. 2013) ("in the context of the California Fraudulent Transfer Act … reasonably equivalent value must be determined from the creditors' standpoint, not from the debtor's"); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008) (under Delaware's version of UFTA, "[t]he determination of whether the debtor received REV should be made from the standpoint of the debtor's creditors, by looking at the net effect of the transfer on the unsecured creditors"); *In re 3dfx Interactive, Inc.*, 389 B.R. 842, 863 (Bankr.N.D. Cal. 2008) ("Because the policy behind fraudulent conveyance law is to preserve assets of the estate, reasonably equivalent value is determined from the standpoint of the estate's creditors, it is not determined from the defendant's perspective.").

Farms house and the Romar Beach condo. They do not, and cannot reasonably, contend that the $10 paid by Mrs. Braswell to Braswell in each transaction comes anywhere close to establishing "reasonably equivalent value." They do not even purport to rely on love, affection and emotional support as furnishing the requisite consideration. Indeed, they do not identify any meaningful consideration whatsoever flowing from transferee to transferor in exchange for the real property at issue.

In lieu of anything that might qualify as valuable consideration for AUFTA purposes, defendants assert that "[i]n exchange for the transfers, Mr. Braswell received the value of large tax savings – money that does not have to be paid to the IRS." (Doc. 104, at 24.) The trouble with this argument is that it does not comport with the AUFTA's definition of "value." The above-cited authorities unambiguously establish that (i) "reasonably equivalent value" or lack thereof is examined from the standpoint of the debtor's creditors, given the statutory objective of protecting creditors; and (ii) consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition of "value." Braswell's May 2009 transfers of real property to his wife depleted his assets to a considerable degree, with no countervailing benefit or utility to his creditors. Rather than helping these creditors, Braswell's transfers actually harmed them by vastly reducing the hard assets available to satisfy his burgeoning liabilities pursuant to the Bama Bayou, Marine Park, and Sundance guaranties.[10] Thus, inasmuch as AUFTA value is assessed from a creditor's perspective, defendants' reliance on "tax savings" and "estate planning" cannot and do not furnish the necessary reasonably equivalent value or valuable consideration necessary to pass muster under the constructive fraudulent transfer provisions of the AUFTA.

Defendants' rejoinder is twofold. First, the Braswells contend that "tax savings" constitute reasonably equivalent value pursuant to *In re Northlake Foods, Inc.*, 715 F.3d 1251 (11th Cir. 2013) and *In re McFarland*, 619 Fed.Appx. 962 (11th Cir. Oct. 16, 2015). In doing so, defendants selectively quote snippets from those decisions (which arise under federal bankruptcy

---

[10]     By defendants' expert's reckoning, if Braswell's speculative, contingent "right of indemnification" as to Gulf World debt is excluded, his total assets plummeted from $4,042,745 to $2,177,745 on May 19, 2009 after he transferred the Sandy Creek Farms house and the Romar Beach condo to Mrs. Braswell. (Doc. 101, Exh. K at Exh. 2.) By contrast, his liabilities exceeded $6 million on that date, according to the defense expert's calculations. (*Id.*) Under the circumstances, any suggestion by defendants that Braswell's asset transfers had any conceivable utility or value to his creditors is unsupportable.

law, rather than the UFTA) for the proposition that "reasonably equivalent value" for a transfer exists where the transfer "confers an economic benefit on the debtor." (Doc. 104, at 24.) Defendants also correctly point out that "[t]he concept of reasonably equivalent value does not require a dollar-for-dollar transaction." (*Id.*) Because the challenged transfers meant that Braswell benefited by "money that does not have to be paid to the IRS" in future estate taxes when he passes away, defendants reason, there must be reasonably equivalent value under the AUFTA. (Doc. 110, at 12.)

Examining those quotations in context, however, leads to a different conclusion. In *Northlake Foods*, the Eleventh Circuit recognized that "[t]he purpose of voiding transfers unsupported by reasonably equivalent value is to protect creditors against the depletion of a bankrupt's estate," but also acknowledged that a transfer should not be voided where "the debtor's net worth has been preserved, and the interests of the creditors will not have been injured by the transfer." 715 F.3d at 1255-56 (citations omitted). Notwithstanding defendants' arguments about tax savings and estate planning, the summary judgment record unambiguously establishes that Braswell's hard assets and net worth fell precipitously as a result of the contested transfers. Far from his net worth being "preserved" by the tax savings, the calculations of defendants' own expert show that it was greatly depleted. Moreover, such depletion of Braswell's net worth harmed his creditors because the value of his assets available for them to collect was well below the value of Braswell's liabilities. Defendants have not identified a single decisional authority under which "estate planning" has been deemed reasonably equivalent value for purposes of a fraudulent transfer analysis. On its face, "tax savings" would not appear to fall within the AUFTA's definition of value. *See* Ala. Code § 8-9A-3 ("[v]alue is given for a transfer if, in exchange for the transfer, ***property is transferred***") (emphasis added). And the Eleventh Circuit has explained that "[w]e scrutinize the value of transfers more closely where, as here, the transfer was made to an insider," such as a spouse. *McFarland*, 619 Fed.Appx. at 975; *see also In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325, 1336-37 (11th Cir. 2007) ("courts are to scrutinize the value of transfers much more closely in situations such as this one, which involve transfers to insiders"). Braswell's one-sided transfers to his wife for no valuable consideration cannot withstand such close scrutiny from a valuation standpoint.

For all of these reasons, the Court concludes on this record as a matter of law that Braswell did not receive a reasonably equivalent value for AUFTA purposes when he transferred

the Romar Beach condo and Sandy Creek Farms residence to Mrs. Braswell in May 2009. His net worth was not preserved and creditors' interests were badly impaired by the transfers. Therefore, this element of Counts Two and Three is satisfied.[11]

### C. Defendants' Rule 56 Motion as to Count One (Ala. Code § 8-9A-4(a)).

Having addressed the common elements, the Court now evaluates the summary judgment motions on a claim-by-claim basis. Defendants (but not plaintiff) have moved for summary judgment on Count One of the First Amended Complaint, which is a cause of action under the AUFTA for actual fraudulent transfer, pursuant to Alabama Code § 8-9A-4(a). That section provides that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor." Ala. Code. § 8-9A-4(a). Thus, to prevail on Count One, SEPH must prove "[t]hat the plaintiff is a creditor of the debtor;" and "[t]hat the debtor transferred an asset or an interest in an asset with the actual intent to injure, delay or defraud the plaintiff or any other creditor of the debtor." 1 *Ala. Pattern Jury Instr. Civ.* § 18.22 (3d ed.). The Court has already found that the record affirmatively establishes SEPH's status as a creditor of Braswell; therefore, that element is satisfied as a matter of law.

With regard to the second element, the law is clear that the debtor must have made the subject transfers with the actual intent to hinder, delay or defraud creditors. *See, e.g., In re Earle*, 307 B.R. 276, 296 (Bankr. S.D. Ala. 2002) ("when the 'actual fraud' fraudulent transfer statutes are at issue, proof of an actual intent to delay or defraud without any legitimate

---

[11]     In so concluding, the Court has considered defendants' repeated argument that the impact of Braswell's transfers on SEPH is irrelevant for purposes of the "reasonably equivalent value" element because that element is solely concerned with <u>unsecured</u> creditors, rather than secured creditors like SEPH. (*See* doc. 104, at 25; doc. 110, at 12-13.) As an initial matter, defendants do not identify any security that Braswell gave for the subject guaranties; therefore, it is unclear how SEPH might properly deemed a "secured creditor" as to debtor Braswell (as opposed to some other debtor or borrower). Besides, the uncontroverted facts are that no value was given for the subject property transfers from Braswell to Mrs. Braswell. Any consideration that might have been given had no value and no utility from the perspective of SEPH and Braswell's other creditors, whether secured or unsecured. And, following the transfers, Braswell's assets were far less than they had been, relative to his liabilities. Quibbling over the semantics of whether SEPH should be termed a "secured" or an "unsecured" creditor cannot obscure the conclusion that no reasonably equivalent value was given in exchange for Braswell's May 2009 transfers of real estate to his wife.

supervening purpose is necessary before a court may conclude that a transfer is a fraudulent one"). Actual intent is a multifactor query. *See, e.g., Aliant Bank v. Davis*, 198 So.3d 508, 512 (Ala.Civ.App. 2015) ("The trial court considers several factors in determining whether the debtor possessed the requisite intent, including to whom the transfer was made, the amount of assets transferred, and the financial condition of the debtor before and after the transfer.") (citation omitted). Indeed, the AUFTA recites a non-exhaustive list of 11 factors that may be considered in determining actual intent for purposes of a § 8-9A-4(a) claim.[12] These circumstantial indicia of intent are sometimes called "badges of fraud." *See, e.g., In re Vista Bella, Inc.*, 511 B.R. 163, 194 (Bankr. S.D. Ala. 2014) ("Actual intent to hinder, delay, or defraud creditors is ordinarily established by circumstantial evidence. … That evidence is typically gathered by a court's consideration of certain badges of fraud … in Ala. Code § 8-9A-4(b)"). "No specific combination of badges is necessary for a finding of actual intent." *Id.* "[I]t is clear that actual intent to hinder, delay, or defraud is a heavily fact-dependent question." *Id.* at 195.

In their summary judgment filings, the Braswells assert that the intent element should be decided in their favor as a matter of law because "only three factors favor SEPH's assertion of" actual fraud and "there is 'significantly clear' evidence of a 'legitimate supervening purpose' (estate planning) to find no intent to defraud." (Doc. 100, at 27-28.) The Court disagrees. The record reasonably supports two competing narratives, to-wit: (i) Braswell transferred the house and condo to his wife as a valid estate planning device to reduce estate taxes; or (ii) Braswell transferred the house and condo to his wife for the purpose of rendering those assets inaccessible to Vision Bank and other creditors to which he was then indebted to the tune of millions of dollars. Construing the record in the light most favorable to SEPH (the nonmovant), facts supporting a reasonable inference of actual fraudulent intent by Braswell include that the

---

[12]        The enumerated factors include whether "(1) The transfer was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer was disclosed or concealed; (4) Before the transfer was made the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." Ala. Code § 8-9A-4(b).

transfers were made to an insider (Mrs. Braswell); that Braswell retained custody and control of the real estate even after the transfers occurred; that Vision Bank had sued Braswell shortly before the transfers were made; that Braswell failed to disclose the transfers to Vision Bank even though he had promised to do so; that Braswell received only $10 from Mrs. Braswell as consideration for each transfer; that Braswell may have been or may have become insolvent as a result of those transfers; and that the timing of Braswell's follow-up meeting with his estate planning attorney to effectuate the transfers is particularly suspect given its temporal proximity to the filing of the *Bama Bayou* Action against him and the bank's foreclosure sales in that action.

Given these record facts, the well-settled legal directive on summary judgment review that all evidence and factual inferences must be construed in the light most favorable to the nonmovant, and the highly fact-specific nature of the actual intent inquiry, the Court declines defendants' invitation to find an absence of intent to defraud as a matter of law at this stage of the proceedings. Genuine issues of material fact abound as to whether Braswell carried out the May 2009 transfers to Mrs. Braswell with the actual intent to hinder, delay or defraud Vision Bank or other creditors. As such, defendants' Motion for Summary Judgment is properly **denied** as to Count One.[13]

---

[13] In arguing otherwise, defendants maintain that summary judgment is appropriate on this claim because "only three factors favor SEPH's assertion" of actual fraudulent intent. (Doc. 100, at 27.) However, the Braswells cite no authority (and the Court is aware of none) holding that fraudulent intent or lack thereof is determined by mechanically counting the number of badges of fraud on each side of the ledger, or that each badge of fraud must receive identical weight. More fundamentally, there are significant factual disputes as to several badges of fraud that the Braswells say are in their favor; thus, it is far from clear at this time that a majority of the badges point against a determination of fraudulent intent. Also, defendants' reliance on *In re Earle*, 307 B.R. 276 (Bankr. S.D. Ala. 2002), is misplaced because *Earle* is distinguishable. For example, in *Earle*, "[t]here was no evidence that Mrs. Earle either had been sued or threatened with suit prior to the transfer." *Id.* at 292. Here, by contrast, there is undisputed evidence of same. Also, the *Earle* determination was made after a trial in which the court concluded as follows: "The Court watched Mrs. Earle testify and ***closely evaluated her credibility*** and the Court finds that she did not intend to hinder, delay, or defraud creditors in forming the trust." *Id.* at 294 (emphasis added). Of course, the undersigned can make no such credibility determinations at the summary judgment stage. For these and other reasons, *Earle* does not support the Braswells' argument that the highly fact-specific inquiry into actual intent must be resolved in their favor on Rule 56 review.

### D. Cross-Motions as to Count Two (Ala. Code § 8-9A-4(c)).

In Count Two, SEPH brings an AUFTA claim against the Braswells for constructive fraudulent transfer, in violation of Alabama Code § 8-9A-4(c).[14] That section provides, in relevant part, that

> "A transfer made by a debtor is fraudulent as to a creditor … if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor … [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."

Ala. Code § 8-9A-4(c)(1). The three elements of a constructive fraudulent transfer claim under § 8-9A-4(c) as pursued by SEPH on summary judgment are that "[p]laintiff is a creditor of the debtor," "the debtor transferred an asset … without receiving a reasonably equivalent value in exchange for the transfer," and "[t]he debtor was engaged or was about to engage in a business transaction for which the remaining assets of the debtor were unreasonably small in relationship to the business or transaction." 1 *Ala. Pattern Jury Instr. Civ.* § 18.21 (3d ed.).[15]

---

[14]    As to both of SEPH's constructive fraud claims, Alabama law "infers constructive fraud when it appears that an indebted grantor has conveyed property to a family member without receiving valuable consideration." *McPherson Oil Co. v. Massey*, 643 So.2d 595, 596 (Ala. 1994); *see also Champion v. Locklear*, 523 So.2d 336, 338 (Ala. 1988) ("Once constructive fraud is alleged in a family transaction, as it has been here, the grantee has the burden of proving the bona fide character of the underlying transaction."); *London v. G.L. Anderson Brass Works*, 72 So. 359, 364 (Ala. 1916) ("when an insolvent or embarrassed husband procures a conveyance to be made to his wife, a presumption will be indulged against her which requires her to affirmatively show that the consideration was paid by her"); *Strategic Well-Site Materials & Logistics, LLC v. Frac Master Sands, LLC*, 2013 WL 1282053, *3 (N.D. Ala. Mar. 25, 2013) (same). "In order to meet the requisite burden of proof, the grantee/spouse is not limited to showing that the consideration that actually passed was sufficient, but may also present evidence of circumstances, salaries, financial contributions from other sources and relevant matters tending to prove that the ownership which was transferred was supported by adequate consideration." *Champion*, 523 So.2d at 338 (citation omitted).

[15]    Both § 8-9A-4(c) and the Alabama Pattern Jury Instructions frame the third element in two alternatives. That element may be satisfied where the plaintiff shows <u>either</u> that the debtor's remaining assets were unreasonably small (as discussed *supra*) <u>or</u> that the debtor "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Ala. Code § 8-9A-4(c)(2). On summary judgment, SEPH invokes only the "unreasonably small" alternative; therefore, that is the only formulation of a § 8-9A-4(c) cause of action addressed here. The Court does not decide, and expresses no opinion as to whether, SEPH could or could not prevail on the § 8-9A-4(c)(2) (Continued)

The Court has already determined, *supra*, that both the creditor/debtor and reasonably equivalent value elements are satisfied with respect to Braswell's May 2009 transfers. Therefore, the only remaining question for the cross-motions as they relate to Count Two is whether the third element (*i.e.*, whether Braswell's remaining assets were unreasonably small) is satisfied here. For fraudulent transfer purposes, the "unreasonably small assets" test "denotes a financial condition short of insolvency," where the challenged transfers "leave the transferor technically solvent but doomed to fail." *In re Fidelity Bond and Mortg. Co.*, 340 B.R. 266, 295 (Bankr.E.D. Penn. 2006) (citations omitted).[16] Comments to the UFTA specify that the "unreasonably small" requirement "focuses attention on whether the amount of all the assets retained by the debtor was inadequate, *i.e.*, unreasonably small, in light of the needs of the business or transaction in which the debtor was engaged or about to engage." *Uniform Fraudulent Transfer Act 1984*, § 4, Comment 4.

To show that Braswell's remaining assets were inadequate in relationship to his business transactions, SEPH enumerates his pending business transactions as of May 19, 2009. In particular, SEPH cites record evidence that, as of that date, Braswell owed $1,985,376 to Vision Bank on his Bama Bayou / Marine Park guaranties (Corbitt Aff., ¶ 14); $921,621 to Vision Bank on his Sundance guaranty (*Id.*, ¶ 15); and $5.6 million on the two Gulf World promissory notes

_____

theory, which would remain available for SEPH to pursue at trial if genuine issues of material fact were to preclude granting summary judgment on either side's Rule 56 Motion as to Count Two.

[16] *See also In re Adelphia Communications Corp.*, 652 Fed.Appx. 19, 21 (2nd Cir. June 15, 2016) ("The test for whether assets are 'unreasonably small' focuses on reasonable foreseeability … and is satisfied if at the time of the transaction the debtor had such minimal assets that insolvency was inevitable in the reasonably foreseeable future."); *ASARCO*, 396 B.R. at 396 (term "unreasonably small assets" references "inability to generate sufficient profits to sustain operations"); *In re Chin*, 492 B.R. 117, 129 (Bankr. E.D.N.Y. 2013) (remaining assets are "unreasonably small" if debtor "is technically solvent but doomed to fail") (citation omitted); *In re Yellowstone Mountain Club, LLC*, 436 B.R. 598, 657 (Bankr. D. Mont. 2010) ("In analyzing whether a debtor was left with unreasonably small assets following the transaction at issue, the test is aimed at transfers that leave the transferor technically solvent but doomed to fail.") (citation and internal marks omitted); *Weintraut v. Commissioner of Internal Revenue*, 2016 WL 4040793, *85 (T.C. July 27, 2016) (for purposes of "unreasonably small asset requirement, …we must evaluate whether at the time of [the] transfers it had the ability to generate enough cash to pay its debts and remain financially stable").

(doc. 101, Exhs. D & E).[17] Defendants' counterargument is to make a conclusory statement that "Braswell had sufficient assets relative to all of these businesses." (Doc. 104, at 26; doc. 110, at 13.)

In support of this blanket assertion about the adequacy of Braswell's assets, defendants propound four arguments. First, they posit that Braswell "participated in paying the Sundance Settlement Note and even paid more than his share." (Doc. 104, at 26; doc. 110, at 13.) By defendants' own admission, however, the "Sundance Settlement Note" was "negotiated in February 2012" (*id.* at 16), nearly three years <u>after</u> the relevant time period for the § 8-9A-4(c) analysis. That Braswell may have participated in paying a Sundance settlement several years later tells us nothing about whether his assets were unreasonably small relative to his ongoing business transactions (including the Sundance guaranty, which had not yet been negotiated down to a settlement note) as of May 19, 2009. Second, defendants state that "Judge Stewart determined the value of the property securing the Bama Bayou loans exceeded the loan amounts." (Doc. 104, at 26; doc. 110, at 13.) As discussed in § IV.A., *supra*, however, this assertion is incorrect. Judge Stewart made no such determination, and certainly never made any ruling to extinguish Braswell's guaranty obligations. Third, defendants cite Comment 2 of Section 2 of the UFTA and contend that "this particular issue is a *bona fide* dispute being litigated in State Court." (Doc. 104, at 26; doc. 110, at 13.) But that citation is unhelpful here,[18]

_____

[17]    With respect to these activities, defendants do not challenge SEPH's assertion that these "ongoing transactions" qualify as business transactions in which Braswell was engaged for purposes of a § 8-9A-4(c) constructive fraud analysis. (*See* doc. 104, at 26; doc. 110, at 13.) Nor, for purposes of the Count Two analysis, do defendants appear to contest plaintiff's calculations of the amounts Braswell owed under those ongoing business transactions as of the May 19, 2009 transfer date. (*See* doc. 104, at 26; doc. 110, at 13.) To be sure, in sections of their summary judgment briefs not directly addressing § 8-9A-4(c), defendants advance an argument that those liabilities should be discounted for an insolvency analysis. They have not maintained that similar discounting is necessary for purposes of the "unreasonably small" element of § 8-9A-4(c). Even if they had, that assertion is addressed in § IV.E., *infra*, and will not be duplicated here.

[18]    The UFTA's § 2 creates a presumption of insolvency when a debtor is generally not paying his or her debts as they become due. *See Uniform Fraudulent Transfer Act 1984*, § 2(b). Comment 2 to § 2 clarifies that in determining whether the debtor is paying his or debts as they become due for purposes of that presumption of insolvency, a court should take into account "the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments." *Id.* at Comment 2. But SEPH has not invoked the (Continued)

and defendants provide no other explanation for why they think a "*bona fide* dispute" matters for the "unreasonably small" factor.

Fourth, defendants say the "repurchase of the Gulf World Marine Park proved its value exceeded the amount owed under the Notes." (Doc. 104, at 26; doc. 110, at 13-14.) Defendants' oblique reference to a "repurchase" is, apparently, that in April 2010 the creditors of the $5.6 million in promissory notes that Braswell and others had signed in 2003 and 2004 to buy stock in Gulf World, Inc. repurchased the assets of that entity. (Hardy Dep. (doc. 100, Exh. 4), at 23-24.) Pursuant to the April 2010 repurchase, those creditors released Braswell and the other debtors from the $5.6 million in defaulted promissory notes (as to which Braswell and the other signatories had paid, essentially, zero principal in the intervening six or seven years). (*Id.* at 31, 34.)[19] Defendants' point is, apparently, that Gulf World Marine Park must have been very valuable for the creditors to buy the park back from Braswell and other debtors instead of suing them for $5.6 million. But to say that Gulf World Marine Park had value in April 2010 is not to say that Braswell's remaining assets were adequate relative to his ongoing business obligations as of the May 19, 2009 property transfers to his wife. Indeed, defendants' own expert valued Braswell's interest in Gulf World, Inc. at just $700,000 as of May 2009. (Doc. 101, Exh. K at

---

presumption of insolvency; indeed, insolvency is not even an element of Count Two, which seeks to hold the Braswells liable under § 8-9A-4(c). Whether a *bona fide* dispute would or would not overcome the presumption of insolvency is thus inconsequential for purposes of the Count Two analysis, particularly with respect to the "unreasonably small" element. At any rate, the Court is applying no presumption of insolvency for any aspect of the cross-motions for summary judgment as they relate to Count Two. Defendants' "*bona fide* dispute" argument and reliance on Comment 2 to § 2 of the UFTA is, therefore, unavailing.

[19]      These tangential facts take us fairly far afield from the limited summary judgment inquiry. Nonetheless, as the Court understands it from reviewing the record, the sequence of events was as follows: Two individuals, Ron Hardy and Brad Miller, owned a marine park facility in Panama City, Florida, known as Panama City Gulf World. In 2003 and 2004, Braswell and nine other individuals purchased that facility from Hardy and Miller, pursuant to which each of Braswell and the other buyers signed $5.6 million in promissory notes. By the terms of those notes, Braswell and the other signatories each promised to pay the full amount to Hardy and to Miller. But Braswell and his colleagues fell behind on interest payments, and made no or almost no principal payments at any time. In lieu of suing Braswell or the other makers of the notes for the full $5.6 million amount (as they were legally entitled to do), Hardy and Miller worked out a deal to repurchase the park and release the notes in April 2010.

Exh. 2.)  By contrast, Braswell was on the hook for the full past due amount owed on the subject promissory notes at that time.

The broader point is this:  As discussed *supra*, on May 19, 2009, Braswell was engaged in ongoing business transactions for which he faced direct personal liability in excess of $8.5 million (including $5.6 million for the Gulf World notes, $1,985,376 on the Bama Bayou / Marine Park guaranties, and $921,621 on the Sundance guaranty).  But his assets after transferring the Romar Beach condo and the Sandy Creek Farms house to Mrs. Braswell were, even by defendants' own expert's reckoning, no more than $7,346,975.  (Doc. 101, Exh. K, at Exh. 2.)[20]  Again, the third element of Count Two, as framed by SEPH in its Rule 56 Motion, is whether, as of May 19, 2009, Braswell was engaged in business transactions for which his remaining assets were unreasonably small in relationship to those transactions.  This is not the same as a solvency/ insolvency query; indeed, the case law is clear that this element may be satisfied even when the transferor is technically solvent.  The critical inquiry is whether Braswell's assets following the challenged real estate transfers were adequate in light of the needs of the transactions in which he was engaged.

Construing record evidence in the light most favorable to defendants, the Court answers this question in the negative.  As of May 19, 2009, Braswell had committed himself to business ventures whereby he had personally guarantied or otherwise promised to pay more than $8.5 million for which he could reasonably be expected to be held individually accountable at any time.  Neither he nor his joint venturers had ever paid any meaningful principal on the $5.6 million Gulf World notes.  He had already been sued for the nearly $2 million he owed on the Bama Bayou / Marine Mark guaranties.  And he was on the hook for nearly $1 million in unpaid principal and interest on the Sundance guaranty.  Even under the most generous possible reading of the summary judgment record, Braswell's assets immediately after the transfers topped out at

---

[20]    That figure includes an "asset" described as "Gulf World, Inc. right of indemnification (contribution)," which defendants' expert values at $5,169,230.  By including that line item and valuation as one of Braswell's assets for purposes of this analysis, the Court makes no findings endorsing or adopting it.  In the context of the § 8-9A-4(c) discussion, it is unnecessary to resolve the parties' summary judgment arguments on this point.  Even if that "asset" is included, Braswell's assets were unreasonably small relative to his ongoing business activities once he transferred $1.5 million or more in personal real estate holdings to Mrs. Braswell.

$7.3 million, more than $5.1 million of which was tied up in a speculative, conjectural "right of contribution" as to which Braswell's ability to collect anything from his co-venturers (who, like him, had paid negligible principal on the Gulf World notes in the previous six years despite a balloon payment deadline of January 2007) was suspect, at best.[21] On this record, giving defendants the benefit of all reasonable record inferences, the Court finds as a matter of law that Braswell's remaining assets as of the transfer date were inadequate in light of the needs of the business transactions in which he was engaged at that time. That is to say, Braswell's remaining assets were unreasonably small in relationship to the business transactions and financial obligations he had voluntarily incurred and under which he was then laboring. This element of Count Two is satisfied.

For all of the foregoing reasons, the Court finds that there are no genuine issues of material fact and that SEPH is entitled to entry of judgment in its favor as a matter of law on Count Two, its constructive fraudulent transfer claim pursuant to Alabama Code § 8-9A-4(c). The record unambiguously reflects that a creditor/debtor relationship existed, that Braswell did not receive reasonably equivalent value in exchange for his transfers of the Romar Beach condo and the Sandy Creek Farms house to Mrs. Braswell, and that upon completing those transfers Braswell's remaining assets were unreasonably small in relationship to the ongoing business transactions in which he was then engaged and committed. Defendants are liable on Count Two. Accordingly, plaintiff's Motion for Partial Summary Judgment is **granted** as to Count Two, and defendants' corresponding Motion for Summary Judgment on Count Two is **denied**.

### E. *Cross-Motions as to Count Three (Ala. Code § 8-9A-5(a)).*

Count Three of SEPH's First Amended Complaint asserts an AUFTA claim against the Braswells for constructive fraudulent discharge, in violation of Alabama Code § 8-9A-5(a). That subsection provides as follows: "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer." Ala. Code § 8-9A-5(a). To prevail on

---

[21]     Certainly, the $5.1 million amount was not then (and potentially not ever) available to meet Braswell's financial needs and obligations for those ongoing business transactions in which he was engaged.

Count Three, SEPH must establish the following elements: (i) that SEPH is a creditor of Braswell; (ii) that SEPH's claim against Braswell arose before the May 19, 2009 transfers occurred; (iii) that Braswell made those transfers without receiving a reasonably equivalent value in exchange; and (iv) that Braswell was insolvent at the time or became insolvent as a result of the transfers. 1 *Ala. Pattern Jury Instr. Civ.* § 18.20 (3d ed.).[22]

The first and third elements have already been examined in detail in §§ IV.A. and IV.B., *supra*. Pursuant to that analysis, the Court has determined that SEPH was a creditor of Braswell as of May 19, 2009, and that Braswell did not receive a reasonably equivalent value in exchange for those real property transfers to his wife. Thus, those elements are satisfied for summary judgment purposes. As for the second element, there can be no reasonable dispute that SEPH's claim against Braswell arose before the May 2009 transfers. After all, uncontroverted record evidence establishes that Braswell executed guaranties in favor of Vision Bank in 2005, 2006 and 2007. The borrower (Riverwalk/Bama Bayou) defaulted. Vision Bank demanded payment from Braswell and others. When no such payment was forthcoming, Vision Bank filed suit against Braswell in state court in January 2009. Braswell transferred his ownership interest in the Romar Beach condo and the Sandy Creek Farms house to Mrs. Braswell approximately four months later. Given this unrebutted factual showing, no reasonable finder of fact could conclude that SEPH's claim did not arise before the subject transfers were made. This element of Count Three is satisfied.[23]

---

[22]    *See also SE Property Holdings, LLC v. Center*, 2016 WL 7493623, *6 (S.D. Ala. Dec. 30, 2016) ("To prevail on Count Three, then, SEPH must prove each of the following elements: (i) that SEPH is a creditor of Charles and Belinda Trammell; (ii) that SEPH's claim against Charles and Belinda Trammell arose before the transfers were made; (iii) that Charles and Belinda Trammell made the transfers without receiving a reasonably equivalent value in exchange; and (iv) that the Trammells were insolvent at the time or became insolvent as a result of the transfers."); *Lord Abbett Municipal Income Fund, Inc. v. Southern Farms, Inc.*, 2015 WL 9474287, *8 (M.D. Ala. Dec. 1, 2015) ("Under § 8-9A-5(a), Lord Abbett must establish (1) that its claim arose before the transfers were made, (2) that RDG-II made the transfers without receiving reasonably equivalent value in exchange, and (3) that RDG-II was insolvent at the time of the transfers or became insolvent as a result of the transfers.").

[23]    On summary judgment, the Braswells concede that "SEPH's Claim Arose Before Transfers." (Doc. 104, at 23.) Nonetheless, they suggest that this element is not satisfied because "SEPH does not have a 'claim' against the Braswell's [*sic*] …. Although the claim arose before the transfers, it was extinguished before the transfers as well." (*Id.*) This statement (Continued)

The fourth and final element of Count Three is that the plaintiff must establish that "the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer." Ala. Code § 8-9A-5(a). The AUFTA provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Ala. Code § 8-9A-2(a). And the statute defines an "asset" as "[p]roperty of a debtor." Ala. Code § 8-9A-1(2). In applying these concepts to Braswell's balance sheet as of May 19, 2009, the parties have sparred at length about many particular valuations and entries contained in their dueling accountants' expert reports. However, SEPH's Motion for Partial Summary Judgment streamlines the analysis by focusing on a single, potentially dispositive line item. In particular, SEPH correctly observes that the Braswells' expert witness, Mark A. Pawlowski, CPA/ABV, CVA, has valued Braswell's assets at $7,346,975 immediately after the May 19, 2009 transfers, and his liabilities at $6,130,756. (Doc. 101, Exh. K at Exh. 2.) If we accept all of Pawlowski's (and hence, defendants') calculations at face value, then upon completing the transfers Braswell's assets exceeded his liabilities by the sum of $1,216,219, or $7,346,975 minus $6,130,756. What that means is that, if the summary judgment record does not reasonably support Pawlowski's inclusion of $1,216,220 in assets, or his exclusion of $1,216,220 in liabilities, or some combination of the two that equals or exceeds that amount, then Braswell was insolvent within the plain meaning of the AUFTA definition on May 19, 2009.

The entry on the Pawlowski balance sheet which SEPH highlights for scrutiny in its Motion for Partial Summary Judgment is his listing of an asset for Braswell labeled "Gulf World, Inc. right of indemnification (contribution)" and valued at $5,169,230. (Doc. 101, Exh. K at

_____

is both factually and legally incorrect. There is no record evidence supporting a reasonable inference that SEPH's claim against Braswell to make good on his guaranty obligations was "extinguished" prior to May 19, 2009. To the contrary, that claim has never been extinguished, even to this day. It remains active and pending in the *Bama Bayou* Action in Mobile County Circuit Court. Judge Stewart has never entered a ruling erasing or extinguishing the debt, much less finding that Braswell owes no contractual obligations to SEPH under the subject guaranties. Nor has there been a judicial finding that "[t]he value of the Bama Bayou assets exceed the liabilities." (*Id.*) Even if there had been such a finding, it would not support defendants' "extinguishment" argument because the Braswells have identified nothing (and the Court is aware of nothing) in Alabama law, the subject guaranties, or anywhere else would obligate SEPH to seek satisfaction of the Bama Bayou / Marine Park debt by foreclosing on the mortgaged property antecedent to pursuing collection remedies against Braswell individually.

Exh. 2.)  This entry relates to Braswell's $5.6 million liability on the Gulf World promissory notes he and others made in 2003 and 2004.  (Doc. 101, Exh. D & E.)  As discussed *supra*, uncontroverted record evidence confirms that neither Braswell nor the other signatories paid any substantial principal on those notes between 2003 and May 2009, and that they missed a number of interest payments and the January 2007 balloon payment.  (Hardy Dep. (doc. 101, Exh. C), at 13-23.)  There is no dispute that the creditors (Hardy and Miller) had the contractual right to sue any one of the makers of those notes for the entire $5.6 million principal amount.  (Hardy Dep. (doc. 104, Exh. C), at 57 ("if I have to repossess it or if it doesn't get paid, then they all have to be individually responsible for the total amount").)  Stated differently, the makers' repayment obligations on the Gulf World notes were joint and several, such that each of them was responsible for the entire unpaid balance of $5.6 million.  The Gulf World notes were unpaid and could have been declared in default as of May 19, 2009.  As such, Hardy and Miller could have sued Braswell individually for the entire $5.6 million balance at that time.  However, it is undisputed and agreed among the parties that, in that scenario, Florida law would have conferred upon Braswell a right of contribution from the other makers of the notes.  *See* Fla. Stat. § 673.1161(2) (generally, "a party having joint and several liability who pays the instrument is entitled to receive from any party having the same joint and several liability contribution in accordance with applicable law").[24]  In other words, if Braswell had "paid the instrument," he would be entitled to receive contribution from the other eight (or in the case of one of the notes, nine) makers.

Defendants' position is that this right of contribution belongs on Braswell's balance sheet as an asset valued at $5,169,230 as of May 19, 2009.  In his report, defendants' accountant Pawlowski explains the reasoning for doing so as follows:

> "[S]hould Mr. Hardy and Mr. Miller pursue the notes against any of the individuals on the note each of those individuals would have a right to indemnification (contribution) from the other shareholders on the note.  In my

---

[24]     Defendants do not explain their reliance on Florida law for the "right of contribution" analysis; however, the Court observes that one of the subject promissory notes lists a location of Panama City, Florida (doc. 101, Exh. E) and that the notes were executed in connection with the makers' purchase of a marine park facility in Panama City, Florida.  Plaintiff has not maintained that a different state's law applies, much less suggested that the analysis would be materially different under any such jurisdiction's authority.

opinion, this would be an asset on the personal financial statement of George S. Braswell. … I have calculated the indemnification to be valued at $5,169,230 (which is the $5,600,000 Hardy/Miller notes net of George S. Braswell's interest of $430,770 - $5,600,000 time 7.692307%)."

(Doc. 101, Exh. K, at 3.)[25] Thus, while it is undisputed that Braswell personally had a $5.6 million liability on the two Gulf World promissory notes and that Hardy and Miller could have sued Braswell alone to collect that amount, defendants' theory is that if Braswell had paid the instrument he would have then had an asset in the form of a statutory right of contribution against the other makers of the notes. The legitimacy or illegitimacy of that "asset" is the difference between solvency and insolvency on Braswell's financial statement, as prepared by Pawlowski.

SEPH persuasively argues that inclusion of that "right of contribution" asset is improper for AUFTA insolvency purposes. The pertinent analysis necessarily focuses on a debtor's assets and liabilities at the time of the challenged transfers, that is, as of May 19, 2009. *See* Ala. Code § 8-9A-5(a) (reciting element of constructive fraudulent transfer that "the debtor was insolvent ***at the time*** or the debtor became insolvent ***as a result of the transfer***") (emphasis added). The right of contribution was not an "asset" (*i.e.,* property of the debtor, Braswell) on May 19, 2009 for the simple reason that he held no right of contribution on that date. Under the Florida indemnity statute on which defendants rely, Braswell's right of contribution from the notes' other makers would arise only after he "pays the instrument." Fla. Stat. § 673.1161(2). Braswell had not paid a penny of the instrument (much less $5.1 million over and above his fair share, whether defined as his percentage of ownership or a *pro rata* fraction of the notes) as of May 19, 2009. Hardy and Miller had not initiated collection activities against him under the Gulf World notes. He could not have sued anybody for $5.1 million that day even if he had wanted to do so. None of those facts are in dispute. Inasmuch as (i) Braswell had paid $0 toward the Gulf World notes as of May 19, 2009; (ii) Braswell had not been personally sued under the Gulf World notes as of

---

[25]     In summary judgment briefing, defendants argue that "[u]nder Florida law, stockholders' right to contribution is divided equally among the signers of the Notes, and not apportioned according to their percentage of ownership." (Doc. 104, at 17.) Yet that statement flies in the face of Pawlowski's stated methodology in calculating the value of that "asset" by netting out Braswell's percentage of ownership in Gulf World, as opposed to his equal share of the Gulf World notes. Defendants have not reconciled the discrepancy.

May 19, 2009; and (iii) the Florida statute conferred upon Braswell a right to contribution from other makers only after he "paid the instrument;" he held no then-actionable right of contribution from other makers of the Gulf World notes as of May 19, 2009, much less an "asset" valued at $5,169,230. What's more, inclusion of that line item in Braswell's assets presupposes that he would (or even could) pay the entire $5.6 million obligation under the notes,[26] and that he would (or could) recover the full amount net of his fair share from all of the other makers.[27] Those assumptions are devoid of any factual basis in the record. And defendants have failed to discount these amounts to account for any of these contingencies. Thus, the resulting $5.169 million "asset" listed on Braswell's balance sheet according to Pawlowski is unsupported by any record facts and is entirely speculative and conjectural. On this showing, no reasonable finder of fact could conclude that Braswell possessed any right of contribution from anybody as of May 19, 2009, much less that such a right was fairly valued at $5.169 million for purposes of an AUFTA insolvency analysis.

For the foregoing reasons, the Court agrees with plaintiff that the "right of contribution" was not an asset held by Braswell as of May 19, 2009, and that it therefore does not count in the AUFTA insolvency analysis.[28] Moreover, even if were properly counted as an asset, defendants'

---

[26] Under defendants' own citations of authority, Braswell would have had a right to contribution of $5.1 million from the other makers only if he first paid off the entire $5.6 million promissory notes. But the record unambiguously establishes that he was incapable of paying that amount; after all, Pawlowski's calculations show that, as of May 19, 2009, Braswell's total assets (excluding the right to contribution) were $2,177,745 (or $7,346,975 - $5,169,230). So Braswell could not have "paid the instrument" in its entirety even if he had wanted to, so as to trigger a right to contribution in the amount of $5.1 million that defendants claim as the valuation of that "asset."

[27] Recall that each of the other eight or nine makers would only be liable in contribution up to his proportional share. Defendants identify no evidence that any of those makers (much less all of them) had sufficient resources to reimburse him their equitable shares via contribution even if he had sued them. Such a result seems highly questionable given the undisputed record evidence that these same makers had been delinquent in making interest and principal payments on the Gulf World notes when they became due.

[28] On summary judgment, defendants argue that Braswell's right of contribution qualifies as a "claim" within the meaning of Alabama Code § 8-9A-1(3). (*See* doc. 104, at 17.) That may be so, but a "claim" is significant only for the debtor/creditor element of an AUFTA cause of action. *See* Ala. Code § 8-9A-1(4) (defining "creditor" as "a person who has a claim"); Ala. Code § 8-9A-1(6) (defining "debtor" as "a person who is liable on a claim"). The statute's (Continued)

$5.169 million valuation of that asset lacks any reasonable basis in fact, but is instead grounded in layers upon layers of speculation unsupported by record evidence (*i.e.*, that Hardy and Miller would sue Braswell; that Braswell would or could pay the entire $5.6 million notes so as to create a right of contribution in the amount of $5.1 million; that each of the other makers of the notes would or could reimburse him for their prorated shares in the notes; etc.). On this record, no reasonable finder of fact could conclude that Braswell possessed a "Gulf World Inc. right of indemnification (contribution)" valued at $5,169,230 as of March 19, 2009. That asset is properly excluded from Braswell's balance sheet. When the value of that asset is backed out, even using Pawlowski's calculations, the sum of Braswell's debts was greater than all of his assets at a fair valuation, as of March 19, 2009. Therefore, Braswell was insolvent as a matter of law. That element of § 8-9A-5(a) is satisfied.[29]

---

definitions of "asset" and "property" make no reference to "claims," so defendants' insistence that the right to contribution satisfies the statutory definition of a "claim" does not advance their position.

[29] Even if the inclusion of the Gulf World right of contribution as an asset on Braswell's financial statement were legally or factually supportable (which it is not), and even if a reasonable finder of fact could conclude on this record that such "asset" was fairly valued at $5,169,230 for purposes of an insolvency analysis (which it could not), summary judgment would remain appropriate on Count Three. Here is why: Recall that the Braswells' expert witness calculated the difference between Braswell's assets and liabilities as being approximately $1.2 million on May 19, 2009. In order to reach that outcome, Pawlowski did not list (or assigned a value of $0 to) Braswell's guaranty obligations to Vision Bank for the Bama Bayou / Marine Park loans among his liabilities. Such a result is both legally and factually untenable. As of May 19, 2009, those loans were in default and Vision Bank had sued Braswell, not only to recover the $1,155,000 in principal guaranties that Braswell had made on those defaulted loans, but also to recover 100% of all accrued interest (payment of which Braswell had also guaranteed) which totaled more than $800,000 as of that date. SEPH's evidence shows all of these facts, and plaintiff correctly points out that Braswell "has submitted no evidence that this debt is not owed." (Doc. 108, at 12; *see also id.* at 8 ("Defendants have not presented any evidence to rebut SEPH's evidence that Braswell owed Vision Bank $1,985,376 on May 19, 2009.").) If this $1.9 million is added to Braswell's liabilities on Pawlowski's ledger, then even if all of defendants' calculations are otherwise accepted at face value, Braswell was insolvent for § 8-9A-5(a) purposes on May 19, 2009 after the real estate transfers to his wife, because the sum of his debts was greater than the sum of his assets at a fair valuation. Defendants' only arguments against including those liabilities in the Braswell insolvency analysis are that (i) the October 2016 Order in the *Bama Bayou* Action eliminated the debt (which, as the undersigned has already addressed *supra*, is not so), and (ii) those liabilities are contingent and therefore must (Continued)

In short, the Court finds no genuine issues of material fact as to Count Three. The summary judgment record conclusively establishes that SEPH has met all elements of an AUFTA cause of action for constructive fraudulent transfer pursuant to Alabama Code § 8-9A-5(a), inasmuch as SEPH was a creditor of Braswell as of May 19, 2009, SEPH's claim against Braswell arose prior to the subject transfers, Braswell made those transfers without receiving a reasonably equivalent value in exchange, and Braswell was insolvent or became insolvent as a result of those transfers. Defendants are liable on Count Three. Accordingly, plaintiff's Motion for Partial Summary Judgment is **granted** as to Count Three, and defendants' countervailing Motion for Summary Judgment on Count Three is **denied**.

### F. Defendants' Rule 56 Motion as to Count Four (Conspiracy).

Finally, Count Four of the First Amended Complaint asserts a common-law claim for civil conspiracy, alleging that "Vennie Braswell conspired with George Braswell in effecting said fraudulent transfers by planning and actively participating in said transfers." (Doc. 22, ¶ 51.) Defendants move for summary judgment on this cause of action for the stated reasons that (i) "SEPH has failed to produce evidence to support either actual fraud or constructive fraud claims," and (ii) "there is no evidence that [Mrs. Braswell] planned with Mr. Braswell to transfer assets." (Doc. 100, at 34.) Neither argument is meritorious on Rule 56 scrutiny. First, as addressed extensively *supra*, SEPH has indeed produced considerable evidence to support its claims of actual and constructive fraudulent transfer against the Braswells; therefore, Count Four is not legally infirm for want of evidence of an underlying tort.[30]

---

be discounted (but defendants have neither made any showing that Braswell is not liable to SEPH in the *Bama Bayou* Action in the specified amount nor offered any evidentiary or technical basis for performing the "discounting" that they say should happen). On this record, the Court finds that a § 8-9A-5(a) insolvency analysis must account for Braswell's guaranty obligations to SEPH on May 19, 2009, and that doing so leads inexorably to a finding that Braswell was insolvent on that date <u>even if</u> defendants' expert calculations are accepted as true and correct in all other respects (including the aforementioned $5.1 million right of contribution). This is an alternative basis for the Court's determination that SEPH is entitled to summary judgment on Count Three.

[30]    To be clear, the Court agrees with defendants that, under Alabama law, a common-law conspiracy claim requires an underlying wrong. *See, e.g., Freeman v. Holyfield*, 179 So.3d 101, 106 (Ala. 2015) ("liability for civil conspiracy rests upon the existence of an underlying wrong and if the underlying wrong provides no cause of action, then neither does the (Continued)

Second, defendants' contention that no evidence links Mrs. Braswell to any fraudulent transfer scheme is incorrect. Braswell transferred more than $1 million in assets to his wife after he had been sued, without receiving reasonable value, and in a manner that left him with insufficient assets to pay for his ongoing business transactions and debts. Perhaps a reasonable finder of fact could conclude at trial that Mrs. Braswell was unaware of these machinations. But, on this record, the evidence does not compel such a finding. After all, "[t]he existence of the conspiracy must often be inferentially and circumstantially derived from the character of the acts done, the relation of the parties, and other facts and circumstances suggestive of concerted action." *Turner v. Peoples Bank of Pell City*, 378 So.2d 706, 708 (Ala. 1979); *see also Eidson v. Olin Corp.*, 527 So.2d 1283, 1285 (Ala. 1988) ("By its very nature, the existence of a conspiracy must often be inferred from circumstantial evidence and the relationship of the parties, as opposed to direct evidence."). Notwithstanding Mrs. Braswell's denial of knowledge of her husband's investments, obligations and liabilities, and the paucity of direct evidence of a conspiracy, the circumstantial evidence and relationship of the Braswells are suggestive of concerted action; therefore, a triable issue of fact remains, and summary judgment is inappropriate. Defendants' Motion for Summary Judgment is **denied** as to Count Four.

## V.    Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.    Defendants' Motion for Summary Judgment (doc. 99) is **denied**;

2.    Plaintiff's Motion for Partial Summary Judgment (doc. 98) is **granted**;

3.    The Court finds as a matter of law that defendants are liable to plaintiff on Counts Two and Three, which assert claims of constructive fraudulent transfer in violation of Alabama Code § 8-9A-4(c) and § 8-9A-5(a);

4.    As to Counts One and Four, this action remains set for Final Pretrial Conference on July 25, 2017 at 10:00 a.m., with jury selection to follow on August 1, 2017; and

---

conspiracy"). But SEPH has made a substantial showing that the Braswells engaged in actionable underlying wrongs, so as to support viable fraudulent transfer actions against them. As such, Count Four is not subject to dismissal for lack of a predicate tort.

5.      With respect to remedies for Counts Two and Three, the parties must submit their respective (or, if possible, joint) proposals for how that issue should be addressed (*i.e.*, via separate hearing, during the trial, via written submissions, etc.) as part of their Joint Pretrial Document, and that matter will be discussed at the Final Pretrial Conference.

DONE and ORDERED this 7th day of June, 2017.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE